**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 96-50356**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**JLM AVIATION INTERNATIONAL, INCORPORATED;**
**JOSE L. MENDIOLA; ARTHUR STEWART,**

**Defendants-Appellants.**

_____

Appeal from the United States District Court
for the Western District of Texas

(SA-95-CR-78)

_____

July 25, 1997

Before POLITZ, Chief Judge, DeMOSS, Circuit Judge, and DOHERTY,[1]
District Judge.

PER CURIAM:[2]

_____

[1]  District Judge of the Western District of Louisiana, sitting
by designation.

[2]  Pursuant to 5TH CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Defendants were each involved in different aspects of the aircraft part manufacturing business. As a result of a federal investigation, they were each tried for charges relating to the manufacturing of counterfeit, defective, and fraudulently documented aircraft parts for resale and installation in civil aircraft. Following a jury trial, Appellants JLM Aviation International, Inc., Jose Mendiola, and Arthur Stewart were convicted of conspiracy to defraud the United States, 18 U.S.C. § 371, to commit mail fraud, 18 U.S.C. § 1341, and to commit wire fraud, 18 U.S.C. § 1343. JLM and Mendiola were additionally convicted of making false statements in a matter within the jurisdiction of the United States, 18 U.S.C. § 1001. Defendants appeal their respective convictions. For the following reasons, we AFFIRM the convictions and sentence as to JLM Aviation International, Inc. and Jose Mendiola, and we VACATE the convictions and sentence as to Arthur Stewart.

**INTRODUCTION**

In 1992, Jose Mendiola ("Mendiola") was the owner, operator, and president of JLM Aviation International, Inc. ("JLM"), in Naperville, Illinois. JLM is a broker of aircraft parts. Customers contact JLM for certain parts, which JLM attempts to secure through third-party suppliers. Once the parts are obtained from the supplier, JLM resells them to its customer for a profit.

Generally, the customer has no contact with, and does not know the identity of, the third-party supplier. The supplier simply provides the parts to JLM which repackages them, provides any necessary certification forms, and ships the order to the customer.

In the spring of 1992, Mendiola attended an industry conference in the Dominican Republic where he met Manuel Nieves ("Nieves") of Total Nacelle Systems, Inc. ("Total Nacelle") of Hondo, Texas. Shortly after the conference, Mendiola asked Nieves if Total Nacelle could machine some Boeing bolt assemblies identified by part number 69-13995-4.[3] Mendiola sent Nieves a purported sample of the Boeing bolt assembly ("sample bolt").

Because Total Nacelle did not have the capability to make such a bolt, Nieves referred Mendiola to his business partner, Arthur Stewart ("Stewart"), who was General Manager of another aviation repair and machine shop, Gary Aerospace, Inc. ("Gary Aerospace"), also in Hondo, Texas. Nieves gave the sample bolt to Stewart at Gary Aerospace.

---

[3] Boeing Aircraft Company manufactured Boeing 727 aircraft from 1963-1984. Boeing is the original equipment manufacturer ("OEM") for airplanes that are still in service. Many of the aircraft parts manufactured by Boeing are "proprietary design parts." These Boeing proprietary design parts have part numbers with distinctive prefixes that are recognized throughout the industry. For example, any part number beginning with "69" is a Boeing proprietary part. The bolt at issue in this case, No. 69-13995-4, holds the roller bearings of the tracks upon which the wing slats of a Boeing 727 aircraft extend and retract. Although Boeing proprietary parts may be obtained at discounted prices in the surplus market, these surplus parts were originally manufactured by Boeing.

3

Employees at Gary Aerospace determined that the sample bolt was a modified National Aerospace Standard bolt, part number 6708-52 ("NAS 6708-52").[4]  It is undisputed that the Boeing proprietary bolt was manufactured by making certain modifications to the NAS 6708-52 bolt.  Stewart's employees told him that they could replicate the Boeing proprietary bolt by copying or "reverse engineering" the sample.  Gary Aerospace notified JLM that it could provide the modified bolts and that "[c]ertification will be provided from the manufacture [sic] of the NAS6708-52 bolt.  Also, Gary Aerospace will certify 'manufactured' as per sample provided."  Gary Aerospace did not state that it could offer bolts which would certify to the Boeing proprietary number; Gary Aerospace promised only JLM that it could offer bolts which would certify to the NAS number.

In the summer of 1992, JLM sent Gary Aerospace purchase orders for over 1,200 bolts.  After soliciting bids from several companies, Gary Aerospace ordered and received approximately 1,200 unmodified NAS bolts from Ameritech Fastener Manufacturing, Inc. ("Ameritech").  Ameritech provided documentation showing that these bolts were certified to NAS standards.

---

[4]  NAS parts are "standard" parts, which require no special certification by the FAA for use in aircraft.  Boeing proprietary bolt 69-13995-4 was manufactured by making certified modifications to the NAS 6708-52 bolt.

Upon receiving the NAS bolts from Ameritech, Gary Aerospace modified them to meet the specifications of JLM's sample bolt. In the fall of 1992, Gary Aerospace made five shipments of bolts to JLM. The first shipment contained a copy of the NAS certification from Ameritech, with Ameritech's name blacked-out.[5] The following four shipments contained shipping orders which read, "Bolts, NAS6708-52 modified to 69-13994-4 per sample." All of the shipping orders displayed the Gary Aerospace corporate logo.

After JLM and Mendiola received the bolts from Gary Aerospace, Mendiola sold 1,301 of them to Mexicana Airlines. The certification which accompanied these bolts described them as "new" and "originally manufactured by Boeing or one of their authorized licensees." JLM's certification further provided that "[t]his certification is based on documentation supplied by our vendor and is on file." Mexicana Airlines purchasing agent Roberto Garcia believed that he was buying genuine Boeing parts from JLM.

In September 1992, Nieves and Stewart had a financial dispute and ended their business relationship. In November 1992, Nieves reported Gary Aerospace's activities to the FAA and provided the agency with a sample of the modified NAS bolts which were being sold by Stewart and JLM, along with a copy of the purported certification.

---

[5]  Gary Aerospace's purchasing agent testified that this practice was not uncommon in the industry, because it prevented suppliers like Gary Aerospace from being circumvented in subsequent orders.

In cooperation with the FBI, the Inspector General's Office of the Department of Transportation ("DOT") opened an investigation. Acting undercover, government agents contacted JLM for price quotes and placed orders for certified Boeing parts. In one instance, the agents received four bolts with a certification stating that the parts were new and manufactured by Boeing or one of its authorized licensees. In another instance, the agents received eight bolts, along with a certification that they had been obtained from "Eastern Airlines." In both instances, the bolt assemblies were found to be counterfeit.

On September 2, 1993, federal agents executed a search warrant at the offices of JLM. The agents seized counterfeit Boeing parts and assorted paperwork. JLM employee Rita Downey informed the agents that Mendiola had also contracted with a company called Pride Maintenance to have other sample parts copied and mass produced.

**DISCUSSION**

To prove conspiracy under 18 U.S.C. § 371, the government must show (1) an agreement between two or more persons, (2) to commit a crime, and (3) an overt act committed by one of the conspirators in furtherance of the agreement. *United States v. Mackay*, 33 F.3d 489, 493 (5th Cir. 1994). The government must further prove "that a conspiracy existed, that the defendant knew of the conspiracy and

6

that he knowingly and voluntarily joined it." ***United States v. Gray***, 96 F.3d 769, 773 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 1275 (1997).  When the conspiracy is to commit mail or wire fraud, the government must show that the conspirators had the requisite intent to defraud.  ***United States v. Sneed***, 63 F.3d 381, 385 (5th Cir. 1995), *cert. denied sub nom*. ***Polley v. United States***, 116 S. Ct. 712 (1996).

To prove mail fraud under 18 U.S.C. § 1341, the government must show (1) a scheme to defraud (2) which involves the use of the mails (3) to execute the scheme.  ***United States v. Fox***, 69 F.3d 15, 17 (5th Cir. 1995).  To prove wire fraud under 18 U.S.C. § 1343, the government must show (1) a scheme to defraud (2) involving the use of, or causing the use of, wire communications in furtherance of the scheme.  ***United States v. Loney***, 959 F.2d 1332, 1337 (5th Cir. 1992); ***United States v. Leahy***, 82 F.3d 624, 634 (5th Cir. 1996).

In determining whether the government has met its burden, we view the evidence, and all reasonable inferences that may be drawn from it, in the light most favorable to the government, and then decide whether a rational trier of fact could have found each essential element of the offense beyond a reasonable doubt.  ***United States v. Prieto-Tejas***, 779 F.2d 1098, 1101 (5th Cir. 1986); ***United States v. Leal***, 30 F.3d 577, 582 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1172 (1995).

## I. *Stewart*

Stewart argues that the evidence at trial was insufficient to support his convictions for conspiracy to defraud, and conspiracy to commit mail fraud and wire fraud. To successfully convict Stewart, the government was required to show, beyond a reasonable doubt, that Stewart intentionally participated in a scheme to defraud by fraudulently selling certain bolt assemblies as original Boeing products. We hold that the government did not meet its burden.

In support of its position, the government points to evidence in the record showing that Stewart asked his employees to modify standard NAS bolts into bolts replicating Boeing bolts. The evidence indicates that several of these employees expressed concerns about the legality of making such modifications. The evidence also indicates that Stewart was aware of their concerns. In the government's words, "Stewart knew that it was illegal for Gary Aerospace to mass produce aircraft parts."

The problem with the government's argument is that it offers no evidence showing that such conduct, even if true, is illegal. Regardless of what his employees may have thought, there is no evidence that Stewart's modification of an NAS bolt to resemble a Boeing bolt is, of itself, a *criminal* act. While replicating a proprietary bolt may violate some civil regulation (an issue about

which we offer no opinion), there is no evidence that such conduct violates any criminal statute.  In short, construing the evidence in a light most favorable to the government, Stewart's act of modifying NAS bolts was not illegal.

Next, the government argues that "a rational jury could conclude that Stewart knew that JLM and Mendiola intended to sell the bolts as Boeing parts, and thus knowingly participated in Mendiola's scheme."  We hold that a rational jury could not reach such a conclusion.

There is absolutely no evidence in the record, circumstantial or otherwise, which would allow a jury to conclude, *beyond a reasonable doubt*, that Stewart intended to defraud JLM, Mendiola, Mexicana Airlines, or any other party.  Piling inference upon inference, the government summarily asserts that Stewart must have known that JLM and Mendiola were going to use the bolts to defraud end-users because "there was no legal authorized use for the substandard aircraft parts manufactured by Gary."  Again, the government's argument is without merit.  The usage of bolts, modified or otherwise, is not governed by criminal law.  While some NAS-modified bolts may be used in aircraft (in which case their usage is governed by civil and regulatory law), other bolts may theoretically be used for different purposes, such as in the building of a particularly sturdy backyard woodshed. Regardless of how the bolts are used, or what proprietary design they bear, mere

possession of them is not criminal.  It stands to reason, then, that the maker of such bolts cannot be held criminally liable on the premise that their only purpose is illegal.  In other words, it cannot be assumed, beyond a reasonable doubt, that Stewart knew, by virtue of his having made the bolts, that they would ultimately be used to commit fraud.

To the extent that there is evidence in the record showing Stewart's intent, Stewart argues that Gary Aerospace's certifications to Mendiola never represented the bolt assemblies as being Boeing products.  The invoices state, "CERTIFICATION WILL BE PROVIDED FROM THE MANUFACTURE (sic) OF THE NAS6708-52 BOLT.  ALSO, GARY AEROSPACE WILL CERTIFY 'MANUFACTURED' AS PER SAMPLE PROVIDED."[6]  Stewart did not make any assertion (oral, written, or otherwise) that the bolts were genuine Boeing bolts.  He merely agreed to modify the NAS bolts "as per sample."  As discussed earlier, the making of such modifications is not illegal. Construing the evidence in a light most favorable to the government, we hold that a reasonable jury could not find that Stewart intended to defraud.

Mindful of the great deference that we must pay to the jury's verdict, *Gray*, 96 F.3d at 772, we nevertheless agree with Stewart and hold that, construing the evidence in a light most favorable to

------

[6] The first invoice did not contain this language.  All subsequent invoices did contain this language.

10

the government, a reasonable jury could not find that Stewart had the requisite intent to defraud. For these reasons, the judgment against Stewart is reversed.

## II.  *JLM & Mendiola*

JLM and Mendiola raise several issues on appeal. First, they argue that the district court erred by admitting against them evidence of the illegal acts of others. At trial, the government introduced evidence that Mendiola and JLM had purchased other counterfeit Boeing parts from Pride Maintenance and sold them to Mexicana Airlines. This evidence was introduced, over objection, through the testimony of Paul Carlson ("Carlson"), whose company had manufactured the counterfeit parts and sold them to JLM through Pride Maintenance. Carlson testified that Mendiola had supplied Pride Maintenance with sample parts to be reproduced. Carlson and Mendiola spoke only twice and, although Carlson usually went through Pride Maintenance, he once shipped the products directly to JLM.

The district court did not indicate whether it allowed this evidence under FED. R. EVID. 402[7] or 404(b).[8]  The government

---

[7]  "All relevant evidence is admissible except as otherwise provided ...."  FED. R. EVID. 402.

[8]  "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent,

11

contends that the evidence was admissible under either rule. The government argues that the evidence was relevant under Rule 402 because Mendiola's transactions with Pride Maintenance were "inextricably intertwined" with the conduct of which he is accused in this case. Furthermore, the government argues that the evidence shows Mendiola's *modus operandi*, which was to send samples of Boeing parts, have copies made, and distribute them as genuine.

The government argues that the evidence was admissible under Rule 404(b) because it tends to prove notice, intent, plan, and knowledge. While evidence of prior bad acts may not be used to show that a defendant had a propensity to act in a particular way, it is admissible to show that the defendant knew what he was doing because he has done it before. The government argues that the probative value of this evidence is not outweighed by its prejudicial effect. Alternatively, the government argues that any error would be harmless.

JLM and Mendiola disagree and argue that the evidence is not admissible because the government failed to show that Mendiola knew that Carlson was making illegal parts. Mendiola also argues that the evidence was improperly used to show propensity. JLM and Mendiola argue that the probative value of this evidence is outweighed by its prejudicial effect.

---

preparation, plan, knowledge, identity, or absence of mistake...." FED. R. EVID. 404(b).

12

"We apply a two-pronged test to determine the admissibility of evidence under Fed. R. Evid. 404(b).  First, the evidence must be relevant to an issue other than the defendant's character.  Second, the evidence must have probative value that is not substantially outweighed by undue prejudice." *United States v. Misher*, 99 F.3d 664, 670 (5th Cir. 1996).

> Step two of the test requires that the testimony not be unduly prejudicial.  We have held that under the Rules of Evidence, there is a strong presumption that probative evidence should be admitted. *United States v. Leahy*, 82 F.3d 624, 637 (5th Cir. 1996) (noting that "while some danger of prejudice is always present, exclusion of extrinsic evidence based on its prejudicial effect 'should occur only sparingly.'") (quoting *United States v. Pace*, 10 F.3d 1106, 1115 (5th Cir. 1993), *cert. denied*, 511 U.S. 1149, 114 S. Ct. 2180, 128 L.Ed.2d 899 (1994)).

*Misher*, 99 F.3d at 670.  "We review a district court's decision to admit extrinsic evidence for abuse of discretion." *Leahy*, 82 F.3d at 636.  After reviewing the record, we find that the district court did not abuse its discretion by allowing the introduction of the Carlson evidence.[9]

Second, JLM and Mendiola argue that the district court abused its discretion by admitting evidence of a profit sharing payment made to former employee and witness Janice Todd.  At trial, the

---

[9] It is unclear whether the district court instructed the jury that this evidence also applies to Stewart.  The question of admissibility against Stewart is moot, however, because we have already determined that Stewart's conviction must be reversed on other grounds.

13

government introduced evidence that former JLM employee Janice Todd received a payment of $2,025 from JLM shortly after the trial date was set. This money was characterized as a "profit-sharing payment," and was sent through the investment firm of Dean Witter Reynolds, which administers JLM's profit-sharing plan. Sigrid Jones, a sales assistant at Dean Witter Reynolds, testified that only three employees had ever been enrolled in JLM's profit-sharing plan: Jose Mendiola, his wife, Marie Mendiola, and Janice Todd. Todd was employed by JLM for over two years, from January 1992 to May 1994. Her responsibilities included taking requests for quotes and researching prices. Approximately one year after Todd had left JLM, and after a trial date had been set, Marie Mendiola instructed Dean Witter Reynolds to establish a profit-sharing account for Todd. The account was paid-out and terminated several weeks later.

The government argues that evidence of the payment was admissible because it tends to show that Mendiola and JLM were attempting to influence Todd's testimony at trial, thereby evincing a consciousness of guilt. *See* **United States v. Gordon**, 987 F.2d 902, 907 (2d Cir. 1993) (attempts to influence witness testimony are admissible to prove consciousness of guilt). Mendiola and JLM argue that the payment was for a legitimate purpose and, therefore, evidence concerning it should have been excluded because its probative value was outweighed by the danger of unfair prejudice.

14

After reviewing the record, we hold that the district court did not abuse its discretion by allowing the admission of this evidence.

Third, JLM and Mendiola argue that the district court erred by considering the Carlson transactions as relevant conduct for sentencing purposes.[10] JLM and Mendiola argue that the Carlson transactions could not be considered relevant conduct because the government failed to show by a preponderance of the evidence that JLM or Mendiola knew that Carlson was engaging in illegal conduct.

"We review the district court's application and legal interpretation of the sentencing guidelines de novo ... and its findings of fact for clear error." *United States v. Ismoila*, 100 F.3d 380, 394 (5th Cir. 1996).

Under U.S.S.G. § 1B1.3, a sentencing court must consider "relevant conduct" in determining a defendant's guideline range. Relevant conduct includes all acts and omissions, committed by the defendant or by others, if reasonably foreseeable, "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3 (a)(1) & (a)(2). "For

---

[10] At sentencing, the district court determined that the loss caused to Mexicana Airlines by Appellants' conduct was approximately $97,000. This loss amount would have required a 6-level increase in Appellants' offense levels. See U.S.S.G. § 2F1.1. The district court found, however, that the involvement of JLM and Mendiola in the Carlson transactions constituted relevant conduct under U.S.S.G. § 1B1.3, and added approximately $500,000 to the loss calculations. The resulting total loss figure, of between $500,000 and $800,000 required a 10-level increase in Appellants' offense levels.

15

two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3 n.9 (emphasis in original). "Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* "Under the sentencing guidelines, a defendant is accountable for all relevant conduct, **United States v. Sotelo**, 97 F.3d 782, 799 (5th Cir. 1996), a concept that includes his own conduct and the foreseeable acts of co-conspirators." **United States v. Gray**, 105 F.3d 956, 970 (5th Cir.), *cert. denied*, 117 S. Ct. 1326 (1997); U.S.S.G. § 1B1.3(a)(1)(B). After reviewing the record, we hold that the district court did not commit clear error by determining that the Carlson transactions were relevant conduct for sentencing purposes.

Next, JLM and Mendiola argue the district court abused its discretion by instructing the jury on deliberate indifference,[11] and

---

[11] The district court instructed the jury as follows:

> The word "knowingly," that is a term that has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or an accident. You may find that the defendant had

16

by failing to give an instruction on subjective knowledge.[12] "We review challenges to jury instructions to determine whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." **Gray**, 105 F.3d at 967 (internal citations omitted). "The district court's charge

---

> knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.
>
> While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

[12] Appellants requested that the following language be included in the charge:

> The Defendant's ignorance must be solely and entirely the result of his having made a conscious purpose to disregard. In that regard, the defendant must be all but certain of the particular crime and of particular matter, and its existence, and that there is a higher probability that the fact exist. In that regard you must judge defendant's actions subjectively from his perspective at the time of the transactions and not what may have been reasonable only after a review of all the evidence and documents. In other words, you are not to judge the defendant from what appears an average person would have done at the time. You must judge the defendant's action based upon what he alone subjectively knew at the time. Furthermore, neither reckless disregard nor suspicion is sufficient. Also remember that an act is not done knowingly if it is done by mistake or accident or other innocent purpose.

must be legally accurate and factually supported by the evidence."
*Id.* In evaluating whether the evidence is sufficient to support the jury charge, we view the evidence, and all reasonable inferences that may be drawn therefrom, in the light most favorable to the government. *Id*. A district court's refusal to give a requested jury instruction is reviewed for abuse of discretion. ***United States v. Clements***, 73 F.3d 1330, 1338 (5th Cir. 1996).

"The purpose of the deliberate ignorance instruction is to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." ***United States v. McKinney***, 53 F.3d 664, 676 (5th Cir.), *cert. denied*, 116 S. Ct. 261 (1995). "It should only be given when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." ***Id.***

JLM and Mendiola based their defense upon, *inter alia*, lack of guilty knowledge or intent to deceive. Furthermore, we have approved this instruction as being a correct statement of law. *See* ***United States v. Investment Enterprises***, 10 F.3d 263 (5th Cir. 1993). After reviewing the record, we hold that there is enough evidence to support the deliberate indifference instruction, and the instruction, as given, was a correct statement of the law. The district court did not commit clear error.

To the extent that JLM and Mendiola raise issues pertaining to the sufficiency of the evidence, we have reviewed the record and find no error.

## CONCLUSION

For the foregoing reasons, the convictions and sentence of Arthur Stewart are **VACATED**. The case against Arthur Stewart is **REMANDED** to the district court for entry of dismissal. The convictions and sentence against JLM Aviation International, Inc. and Jose Mendiola is **AFFIRMED**.